IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

AMBER JOHNSON, TAYLOR THOMPSON,
and R.J., a minor child,

      Plaintiffs,

v.                                                                      No. 1:21-cv-00184 KG-LF

CHARITY SANCHEZ, in her individual capacity,
and DIEDRE MALLON, in her individual capacity,
and
NEW MEXICO CHILDREN, YOUTH &
FAMILIES DEPARTMENT,

      Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

      This matter is before the Court on Charity Sanchez's Motion for Summary Judgment on the Grounds of Qualified Immunity (Doc. 50), which is fully and timely briefed, (Docs. 52, 58, 63, 64). Having considered the briefing and the applicable law, the Court grants the Motion.

I.    *Procedural Background*

      In this case, Amber Johnson, Taylor Thompson, and their minor child, R.J., allege that CYFD improperly placed R.J. into the custody of his paternal grandmother for approximately three weeks after Ms. Johnson was arrested for driving while intoxicated with R.J. in her car. *See generally* (Doc.1-2). Plaintiffs sue case worker Charity Sanchez in her individual capacity, her supervisor Deidre Mallon in her individual capacity, and the Children Youth and Families Department (CYFD). The Court previously dismissed Ms. Mallon from the case, (Docs. 26 & 27), and also CYFD, (Docs. 61& 62). The Plaintiffs allege violations of their civil rights and initially brought claims pursuant to § 1983, the New Mexico Constitution, and the New Mexico Tort Claims Act. The Court, however, dismissed all but the § 1983 claims which allege

1

Fourteenth Amendment substantive and procedural due process violations against Ms. Sanchez. (Doc. 61) at 8.

In her Motion for Summary Judgment, Ms. Sanchez asserts her entitlement to qualified immunity, arguing that the temporary removal she initiated did not violate a clearly established right. Because the Court agrees, the Court grants the Motion based on qualified immunity.

II.     *Legal Standards*

A.  *Summary Judgment*

Summary judgment should be granted if the movant establishes that there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. *Sawyers v. Norton*, 962 F.3d 1270, 1282 (10th Cir. 2020); Fed. R. Civ. P. 56(a). A fact is considered material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–52 (1986). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Id.*

The parties must support factual allegations with evidence and the Court is free to consider materials such as depositions, documents, and affidavits. Fed. R. Civ. P. 56(c)(1)(A). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets this burden, the nonmovant is required to put in the record facts showing that there is a genuine issue for trial. *Anderson*, 477 U.S. at 248–52.

In applying this standard, the Court resolves all doubts against the movant, construes all admissible evidence in the light most favorable to the nonmovant, and draws all reasonable inferences in favor of the nonmovant. *See Hunt v. Cromartie*, 526 U.S. 541, 551–52 (1999); *see*

*also Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). That said, the nonmovant still bears the burden to produce real evidence. The nonmoving party cannot rely upon conclusory allegations, contentions of counsel, speculation, suspicion, or conjecture to defeat summary judgment. *See Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988); *GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1200–01 (10th Cir. 2022). A "plaintiff's version of the facts must find support in the record." *Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011) (citation omitted). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *GeoMetWatch Corp.*, 38 F.4th at 1200 (quoting *Hasan v. AIG Prop. Cas. Co.*, 935 F.3d 1092, 1098 (10th Cir. 2019)).

B. *Qualified Immunity*

Section 1983 of Title 42 authorizes a private cause of action against any person acting under color of state law for "the deprivation of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. Individual defendants named in a § 1983 action, however, "may raise a defense of qualified immunity[.]". *Irizarry v. Yehia*, 38 F.4th 1282, 1287 (10th Cir. 2022) (quoting *Est. of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014)). Qualified immunity "creates a presumption that the defendant is immune from suit." *Truman v. Orem City*, 1 F.4th 1227, 1235 (10th Cir. 2021) (quoting *Est. of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1168 (10th Cir. 2020)). To overcome this presumption, a plaintiff bears a heavy burden to show both (1) that "the defendant's actions violated a constitutional or statutory right" and (2) that the "right was clearly established at the time of the defendant's complained-of conduct." *Irizarry*, 38 F.4th at 1287 (quoting *Truman*, 1 F.4th at 1235).

In other words, "government officials performing discretionary functions generally are granted a qualified immunity and are 'shielded from liability for civil damages insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a
reasonable person would have known.'" *Wilson v. Layne*, 526 U.S. 603, 609, 119 S.Ct. 1692,
143 L.Ed.2d 818 (1999) (internal citation omitted); *see Pearson v. Callahan*, 555 U.S. 223, 231,
129 S.Ct. 808, 172 L.Ed.2d 565 (2009).  This is particularly true in the child removal context
because "considerable deference should be given to the judgment of responsible government
officials in acting to protect children from perceived imminent danger or abuse." *J.B. v.
Washington Cnty.*, 127 F.3d 919, 925 (10th Cir. 1997) (citations omitted).

 Relevant to the disposition of the instant Motion, qualified immunity alters the summary
judgment analysis. *See, e.g.*, *Kapinski v. City of Albuquerque*, 964 F.3d 900, 904 (10th Cir.
2020) (quoting *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1312 (10th Cir. 2009)).  Once a
defendant asserts qualified immunity, "the burden shifts to the plaintiff" to overcome the
presumption that the defendant is protected by qualified immunity. *Id.* (quoting *Koch v. City of
Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011)).  That is, rather than merely show a genuine
dispute of fact exists, the plaintiff must "produce facts sufficient to show both that the
defendant's alleged conduct violated the law and that that law was clearly established when the
alleged violation occurred." *Bruning v. Pixler*, 949 F.2d 352, 356 (10th Cir. 1991) (internal
quotation and citation omitted).  And "although we will review the evidence in the light most
favorable to the nonmoving party…the record must clearly demonstrate the plaintiff[s] [have]
satisfied [their] heavy two-part burden." *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001)
(citation omitted).

 Only if the plaintiff meets this burden does the defendant bear the usual summary
judgment movant's burden of showing no material issues of fact remain that defeat the claim of
qualified immunity. *Bruning*, 949 F.2d at 356;  *see also Koch*, 660 F.3d at 1238; *Kapinski*, 964

F.3d at 905.  If the plaintiff fails to satisfy either prong of the qualified immunity test, the court

must grant qualified immunity and summary judgment.  *McCowan v. Morales*, 945 F.3d 1276,

1282 (10th Cir. 2019) (quoting *Estate of Ceballos v. Husk*, 919 F.3d 1204, 1212–13 (10th Cir.

2019)).

III.    *Factual Background*

On the night of November 1, 2018, Ms. Johnson drove into a New Mexico State Police

sobriety checkpoint in Albuquerque, New Mexico sometime after midnight.  (Doc. 50) at 3,

Undisputed Material Fact ("UMF") 2; (Doc. 58) at 2, UMF 2; Incident Report (Doc. 50) Ex. A.[1]

Because Ms. Johnson entered the checkpoint at a high rate of speed, had no regard for

speedbumps, smelled of alcohol, had bloodshot and watery eyes, and failed a field sobriety test,

an officer determined she was "too much impaired to safely operate a motor vehicle."[2]  (Doc.

50) at 3–4, UMFs 2–3; (Doc. 58) at 2, UMFs 2–3.  Ms. Johnson was arrested and charged with

driving under the influence and because infant R.J. was in the vehicle, abuse of a child.  (Doc.

50) at 3–4, UMFs 1, 5; (Doc. 58) at 2, UMFs 1, 5; *also* Ex. A.  Ms. Johnson was transported to a

State Police office and eventually taken into custody at the Albuquerque prisoner transport

center.  Ex. A at 4.

Meanwhile, police took custody of R.J. and contacted CYFD for assistance.  (Doc. 50) at

4, UMF 6; (Doc. 58) at 2, UMF 6.  Ms. Sanchez, a CYFD case worker, responded to the referral

---

[1] The facts in this section are either undisputed or stated in the light most favorable to the
nonmovant Plaintiffs. *See supra,* Summary Judgment, Section II(A).  To the extent proffered
facts have been omitted, the Court deems them immaterial to the Motion.

[2] The Court notes Ms. Johnson maintains that she did not drink and was not drunk.  (Doc. 58) at
3, UMF B.  But because Ms. Johnson also concedes that CYFD's seizure of R.J. on the night of
her arrest was valid, *id.* at 6, the truth of her inebriation is not material to the disposition of this
Motion.

that night. *Id.* Either police officers or Ms. Sanchez contacted R.J.'s father and paternal

grandfather, but both had been drinking and were deemed unfit to take custody of R.J. (Doc. 50)

at 5, UMFs 8–9; (Doc. 58) at 2, UMFs 8–9; Ex. A at 5; CPS Intake Report (Doc. 50) Ex. C at 4.

Eventually, R.J.'s paternal grandmother, Tracie Thompson, arrived to take custody of R.J. (Doc.

50) at 5, UMF 9; (Doc. 58) at 2, UMF 9. Before releasing R.J. to Tracie Thompson however,

Ms. Sanchez conducted a site visit of her home and completed a safety plan to which Tracie

Thompson consented in writing. (Doc. 50) at 4–5, UMFs 7, 9–11; (Doc. 58) at 2–3, UMFs 7, 9–

11.[3]

The Safety Plan identified physical neglect, alcohol abuse, and endangerment as potential

safety threats to R.J. In-Home Safety Plan (Doc. 50) Ex. B at 1. The Plan called for R.J. to

remain in the custody of Tracie Thompson as the "safety monitor." *Id.* The Plan also prohibited

Ms. Johnson and Mr. Thompson from removing R.J. from Tracie Thompson's care and control

or from having unsupervised visits with R.J. *Id.* Finally, it stipulated that Ms. Johnson and Mr.

Thompson would cooperate with CYFD and follow recommendations for services. *Id.* The plan

was to be reviewed in 30 days. *Id.*

Here the Court resolves an apparent dispute of fact. Ms. Sanchez contends that in

creating the Safety Plan, she "coordinated" with Mr. Thompson and that Mr. Thompson

"approved" of the Plan telephonically. (Doc. 50) at 4, UMF 7 (citing Ex. B at 2 (Safety Plan

noting Mr. Thompson's agreement via telephone)). Plaintiffs, in response to Ms. Sanchez's

---

[3] The Court notes that Plaintiffs dispute Ms. Sanchez's Undisputed Material Fact 11, arguing that
the cited exhibit does not support the contention that Ms. Sanchez conducted a site assessment.
(Doc. 58) at 3, ¶ 11. The Court agrees with Ms. Sanchez, however, that the Intake Report clearly
indicates a site visit was conducted. (Doc. 63) at 3 (citing Ex. C at 4–5); *see also Koch v. City of
Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011) (Though the Court resolves doubts and draws
reasonable inferences for the nonmovant, "a plaintiff's version of the facts must find support in
the record") (citation omitted).

undisputed facts, only "partially agree." (Doc. 58) at 2, UMF 7. Specifically, Plaintiffs do not dispute Mr. Thompson's telephonic agreement, but they do challenge the scope of the agreement, noting that the Safety Plan does not prove specifically that Mr. Thompson was read all the details of the Plan or that he agreed that his son would be in his mother's custody for 30 days. *Id*. Later in the briefing, but not in the material facts section, Plaintiffs go further by arguing that Ms. Sanchez took R.J. "without consulting Plaintiff Thompson," *id*. at 6, and that the Safety Plan was "misrepresented" and "excluded the biological father completely," *id*. at 8.

The Court determines the evidence does not show a genuine dispute of fact. First, factual contentions raised as arguments but not addressed in the statement of material facts section cannot be used to create a dispute of fact. *See* D.N.M.LR-Civ 56.1(b) ("All material facts set forth in the [movant's] Memorandum will be deemed undisputed unless specifically controverted."). Second, while Plaintiffs' statement of material facts questions the validity and scope of Mr. Thompson's consent, it does not specifically or explicitly dispute that Mr. Thompson did, indeed, telephonically consent to the Safety Plan. Thus, the Court deems Mr. Thompson's consent undisputed.

Finally, even looking beyond the proffered factual contentions to the parties' argument and exhibits, Plaintiffs do not present any evidence in support of the allegation that Mr. Thompson did not knowingly consent to the Safety Plan—for example, an affidavit from Mr. Thompson attesting to his lack of knowledge or documentation that he refused to cooperate in the plan or that he revoked his consent at any time. *See Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988) ("[P]laintiffs cannot rely on conclusory allegations [to defeat summary judgment]; they must produce some specific factual support for their claim[.]"). That is, Mr. Thompson's consent to the Safety Plan is supported by

documentary evidence in both the Safety Plan itself, Ex. B, and the Intake Report, Ex. C. Neither Plaintiffs' contradictory and conclusory statements nor their attempts to challenge the scope of Ms. Sanchez's evidence act as countervailing probative evidence. For these reasons, the Court determines that Plaintiffs fail to raise a genuine dispute regarding Mr. Thompson's consent, and that no reasonable jury could find otherwise.

That Ms. Johnson was not consulted in the creation of the Safety Plan and was not a signatory to it is also undisputed. *See* Decl. of Amber Johnson (Doc. 58) Ex. 1 at ¶ 12 ("I was not made a part of the plan and did not sign it."); *also, generally* Exs. A, B, C. She did, however, comply with the plan, at least in part. For example, she participated in a home visit by Ms. Sanchez on November 6, 2018, Ex. C at 5, and she completed an alcohol use assessment with CYFD staff on November 13, 2018, (Doc. 58) at 4, UMF J (citing Ex. C at 5); (Doc. 63) at 4, UMF A.

As many as five different times,[4] Ms. Johnson expressed to Ms. Sanchez that she wanted R.J. "back with her." (Doc. 58) at 4, UMF H (citing Ex. C at 5); (Doc. 63) at 5, UMF F.

---

[4] Ms. Johnson's claim that she requested R.J. back on at least five occasions suffers from the same procedural deficiency as the claim that Mr. Thompson did not knowingly consent—it is presented in argument but not proffered in the material facts section. *See* (Doc. 58) at 14 (citing Ex 1 at ¶ 26 ("I requested the return of my child on at least five occasions from between November 1, 2018 and November 22, 2018.")). Ms. Sanchez was, therefore, unable to address that factual contention in her Reply. The Court, nonetheless, credits Ms. Johnson's Declaration because in addressing qualified immunity, courts ordinarily "must adopt plaintiff's version of the facts." *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1325 (10th Cir. 2009) (Holmes, J., concurring) (quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)). The Court does not determine whether the five-request contention is sufficient to create a genuine dispute of material fact to survive summary judgment because it concludes that the evidence, even accepted as Ms. Johnson alleges it, is insufficient to show a constitutional violation which would defeat qualified immunity. *See infra* Section IV(A); *see also Thomson*, 584 F.3d at 1325 (Holmes, J., concurring) ("We resolve all issues of material fact in favor of the plaintiff, and then, under that version of the facts, determine the legal question of whether the defendant is entitled to qualified immunity" (citation omitted)).

On November 20, 2018, Ms. Johnson, through counsel, expressed to CYFD that she would no longer cooperate with the Safety Plan, and on November 22, 2018, R.J. was returned to his mother's custody—three weeks after her arrest.  (Doc. 50) at 5–6, UMFs 14–15; (Doc. 58) at 3, UMFs 14–15 and 5, UMF O; (Doc. 63) at 4, UMF A.

IV.     *Analysis*

The Court determines that Ms. Sanchez is entitled to qualified immunity because Plaintiffs either insufficiently allege a Fourteenth Amendment violation or fail to show that a relevant right was clearly established.

The Fourteenth Amendment states: "No State shall ... deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  The Due Process Clause encompasses two distinct forms of protection: (i) procedural due process, which requires a state to employ fair procedures when depriving a person of a protected interest; and (ii) substantive due process, which guarantees that a state cannot deprive a person of a protected interest for certain reasons.  *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998)).  The Court notes that Plaintiffs' Complaint potentially implicates two rights arising under the Fourteenth Amendment: (1) the procedural due process right which attaches to the right to parental custody of a child, *see Stanley v. Illinois*, 405 U.S. 645, 651  (1972); and (2) the substantive right to familial association, *see Moore v. City of E. Cleveland, Ohio*, 431 U.S. 494, 499 (1977).  The Court proceeds by structuring its analysis around those two rights.

A. *Plaintiffs Fail to Show a Violation of Procedural Due Process*

Under the Fourteenth Amendment, parents have a protected liberty interest in "the care, custody and control of their children."  *Gomes v. Wood*, 451 F.3d 1122, 1127 (10th Cir. 2006) (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000)).  Because of this, state officials may not

remove children from the home, even temporarily, without providing due process of law through

prior notice and a hearing. *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 753–54 (1983)).

The parental right to custody of a child is not absolute, however. *Id.* at 1128. It must be

balanced against the States' "*parens patriae* interest in preserving and promoting children's

welfare, including a traditional and transcendent interest in protecting children from abuse." *Id.*

(text only). As a result, "state officials may remove a child from the home without prior notice

and a hearing when they have a reasonable suspicion of an immediate threat to the safety of the

child[.]" *Id.* at 1130. In determining whether state officials have a reasonable suspicion of an

immediate threat to the safety of the child, Courts must consider "*all relevant circumstances,*

including the state's reasonableness in responding to a perceived danger, as well as the objective

nature, likelihood, and immediacy of danger to the child." *Id.* at 1131 (emphasis in original)

(citation omitted). Relevant to the claims here, "even in these instances in which emergency

removal is justified, the state must afford the parents a prompt post-removal hearing." *Id.* at

1130.

A lack of post-removal due process is the crux of Plaintiffs' procedural due process

claims. Ms. Johnson and Mr. Thompson do not challenge CYFD's initial seizure of R.J. on the

night of her arrest—in fact, they concede that the initial act was proper. *See* (Doc. 58) at 6

("CYFD's initial seizure of [R.J.] was a valid exercise of its role as an agent of protection for a

child whose parent has been arrested. This issue is not in question in this litigation"). Rather, it

"is the follow up actions taken by CYFD and Defendant Sanchez that is the basis of liability."

*Id.* "[I]n this case, there was no emergency circumstances that justified the barring of

association after November 1, 2021." *Id.* at 7. And "there was no post incident due process

either." *Id.* In summary, Plaintiffs contend that

Based on Tenth Circuit law, the *Hollingsworth*, *Malik*, *Roska*, line of cases provide a bright line rule for state officials, and gave fair warning that absent specific, articulable evidence of an immediate threat to a child, the emergency circumstances exception to the due process clause does not apply. Here there was no emergency circumstances that justified the continued depravation of Plaintiff's Constitutional Rights. Absent reasonable grounds or imminent danger, process is due. Here, process was denied.

*Id.* 58 at 15.

Of course, there is one other ~~way around~~ exception to the notice and hearing requirement for a

temporary removal of a child: parental consent.  For example, "a parent's voluntary consent to a

safety plan obviates the need for any additional due process procedures on the part of [an]

agency seeking to remove [a] child from a parent's custody."  *Teets v. Cuyahoga Cty.*, 460

Fed.Appx. 498, 503 (6th Cir. 2012).  Put differently, "[b]ecause [a] safety plan is voluntary, no

hearing of any kind is necessary."  *Dupuy v. Samuels*, 465 F.3d 757, 761 (7th Cir. 2006).  This is

applicable in New Mexico, which, like the jurisdictions addressed by the Sixth and Seventh

Circuits, offers "safety plans" (also known as "in-home services") as an alternative to court-

enforced removal proceedings.

"The purpose of [In-Home Services] is to promote the safety of children and reduce the

risk of the recurrence of abuse or neglect of children by their parents, guardians or custodians

*without the intervention of the courts*."  8.10.6.7 NMAC (emphasis added); *compare to* NMSA

1978 § 32A-4-7 (limiting CYFD to two-day emergency custody of child before filing petition in

court).  Safety plans can last up to 180 days. 8.10.6.12 NMAC; *but see Darla D. v. Grace R.*,

2016-NMCA-093, ¶ 42 (approvingly discussing indeterminate safety plan).  This does not mean

that everyone will be satisfied with the plan, which is a settlement of sorts, arrived at in lieu of

formal removal and court proceedings. *See*, *e.g.*, *Petty v. Dep't of Hum. Servs.*, No. 16-CV-109-

GKF-FHM, 2017 WL 1483338, at *3 (N.D. Okla. Apr. 24, 2017) ("Admittedly, refusing a safety

11

plan may leave a parent in a worse pickle than if she had accepted it.... But that is a dilemma implicit in any settlement process—without a downside to the alternative, there would be no settlements." (text only)).   A family can withdraw from a safety plan, and when it does, CYFD must decide to close the case or pursue involuntary services through a court order.  8.10.6.20 NMAC.

To the extent Ms. Johnson and Mr. Thompson argue their rights were violated by a lack of notice or a prompt hearing, the Court concludes they have not stated a constitutional violation because a safety plan obviates the need for a post-deprivation hearing.  When a child is removed from parental custody via the emergency circumstances exception—as R.J. was here, initially—a prompt post-depravation hearing is necessary.  But R.J. remained with his grandmother not by court order or the emergency exception, but by virtue of a voluntary plan.

The evidence proffered shows that Mr. Thompson was consulted in creating the plan and that he consented to it by phone.  While it is true that Ms. Johnson did not affirmatively consent by signing the plan at its inception—at the time she was being detained after her arrest—evidence suggests she consented to the plan by voluntarily participating in at least parts of it, such as the alcohol assessment.  Moreover, when Ms. Johnson clearly revoked her consent to the plan in writing on November 20, 2018, R.J. was returned to her custody two days later.

Despite this evidence, Plaintiffs insinuate that the Safety Plan was not consensual.  For example, they claim that Ms. Sanchez took R.J. "without consulting Plaintiff Thompson."  (Doc. 58) at 6.  And they later assert that "Mother requested the return of her child on at least five occasions."  *Id.* at 14.  Though Plaintiffs fail to explicitly state it, the Court takes this allegation to imply that Ms. Johnson revoked her consent to the Safety Plan without receiving custody of R.J.

This is a serious allegation, and the Court considers that a safety plan which is not, in fact, consensual—which is procured through fraud or deceit, or which extends beyond the consent of the parent, for example—would not be a valid safety plan at all and *could* therefore be a fact pattern which implicates constitutional rights to parental custody.  But even if Plaintiffs had cited to cases which established such a right (which they did not), the Court emphasizes that they have not developed a factual record which supports finding any such constitutional violation.  As addressed in the Factual Background, *supra* Section III, the allegations that Mr. Thompson did not have notice of the plan, (Doc. 58) at 10, was not consulted, *id.* at 6, and did not knowingly consent to it, *id.* at 2, are contradicted by the proffered evidence.

And the assertion that Ms. Johnson revoked her consent multiple times without the return of R.J. is too under-supported in the record to state a constitutional violation.[5]  Ms. Johnson properly proffers only a single statement that she "wanted R.J. back with her."  (Doc. 58) at 14 (citing Ex 1 at ¶ 26); *see also supra* Section III.  That statement is not a clear revocation of consent to the Safety Plan, which at the time Ms. Johnson was still participating in by meeting with Ms. Sanchez and submitting to the alcohol assessment.

The other four alleged requests find support in the record only from a single, cursory sentence in Ms. Johnson's declaration.  Decl. of Amber Johnson (Doc. 58) Ex. 1 at ¶ 26 ("I requested the return of my child on at least five occasions from between November 1, 2018, and

---

[5] Recall the principle that in a qualified immunity analysis,

> the objective is *not* to determine whether a plaintiff survives summary judgment because plaintiff's evidence raises material issues that warrant resolution by a jury.  Instead, the principal purpose is to determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the *legal* question before the court [*i.e.*, whether plaintiff's constitutional rights were violated].

*Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1326 (10th Cir. 2009) (Holmes, J., concurring).

November 22, 2018").  As evidence, the declaration lacks critical details which could lend it weight and help the Court draw substantiated conclusions.  On what dates the requests were made, via what mode of communication, using what words are all relevant and probative details unknown to this Court or any other fact finder.  Whether the requests amounted to a revocation of consent to the Safety Plan, the Court cannot reasonably determine.  The Court concludes Plaintiffs have not met their burden to clearly show a lack of consent which would implicate a constitutional issue.

In this case, R.J. was placed with his grandmother under the terms of a safety plan.  At the risk of repetition, under a consensual safety plan, no hearing or other due process is required.  Therefore, to the extent Plaintiffs' claim relies on the post-deprivation due process owed under the emergency circumstances exception, it fails to state a constitutional violation as a matter of law.  Additionally, to the extent Plaintiffs imply the Safety Plan was nonconsensual, they build an insufficient factual record.  For these reasons, Ms. Sanchez is entitled to qualified immunity on the procedural due process claim.

B. *Plaintiffs Fail to Show a Violation of the Right to Familial Association*

The "familial right of association" is a substantive due process right.  *Halley v. Huckaby*, 902 F.3d 1136, 1153 (10th Cir. 2018) (citations omitted).  The government's "forced separation of parent from child, even for a short time, represents a serious impingement on a parent's substantive due process right to familial association."  *Doe v. Woodard*, 912 F.3d 1278, 1300–01 (10th Cir. 2019) (internal quotations and citations omitted).  That impingement is necessary but not sufficient to make a claim.  The Tenth Circuit has recently clarified that in cases seeking relief for executive branch action infringing on familial association rights, courts must apply a "shocks-the-conscience" standard.  *Halley*, 902 F.3d at 1153.  "For executive action to shock the

14

conscience requires much more than mere negligence." *Id.* at 1155 (citation omitted).  A

plaintiff "must prove a government actor arbitrarily abused his authority or employed it as an

instrument of oppression." *Id.* (internal quotation marks and citation omitted).  "The behavior

complained of must be egregious and outrageous." *Id.* (citation omitted).

The shocks-the-conscience standards results in a two-pronged test.  A plaintiff must

show: (1) that the government actor intended to interfere with the family relationship, and (2)

that the government actor caused an "unwarranted and severe intrusion," or an undue burden, on

the family relationship.  *Id.* at 1155–1156.  Whether the official unduly burdened the family

relationship "depends on the *severity* of the infringement on the protected relationship, the need

for defendants' conduct, and possible alternative courses of action." *Id.* at 1155 (emphasis in

original).

Plaintiffs allege a violation of the right to familial association in the following ways:

-        "The facts alleged by Plaintiffs in the complaint show that Defendant Sanchez

intended to deprive Plaintiffs of their protected relationship with their child…and effected an

unwarranted instruction [*sic*] into their family relationship,"  (Doc. 58) at 8;

-        "Defendant Sanchez did nothing but intentionally kept R.J. from the parents," *id.*

at 10; and,

-        "Defendant Sanchez acted with reckless disregard and deliberate intention in

denying parents and child their protected right to the family association and family unit," *id.* at

11.

The Court concludes that Ms. Sanchez is entitled to qualified immunity on any familial

association claim because Plaintiffs fail to state a constitutional violation.  Allegations that Ms.

Sanchez acted with intentionality are conclusory while Plaintiffs proffer no facts supporting such

a conclusion.  In a case cited by both parties, *J.B. v. Washington Cnty*, the Court addressed a similar situation—a temporary removal to interview a child about potential abuse—and reasoned that the mere fact of removal was not indicative of intentionality.  127 F.3d 919, 927–28 (10th Cir. 1997).

> We agree with the district court that while the County's objectives might have been accomplished within a shorter period, there is no evidence that the County officials intended or directed their conduct in this matter at the familial relationship of [children and parents] with knowledge that such conduct would adversely affect the relationship as required by this court…. Absent such evidence of wilfulness or intent, the district court appropriately determined that no genuine issue of material fact exists as to plaintiffs' substantive due process claims.

*Id.* at 928 (text only).

The familial association claim also fails on the unwarranted intrusion element.  Nowhere in their argument do Plaintiffs address the severity-of-infringement, need-for-conduct, or alternative-courses-of-action factors.  The alleged acts—implementing a family safety plan, conducting assessments related to alcohol abuse, and maintaining the family separation for three weeks—while long and no doubt frustrating, do not amount to behavior which is an instrument of oppression, egregious, outrageous, or which shocks the conscience.  And Plaintiffs do not cite to any similar cases which by analogy may support the conclusion that a temporary safety plan may be demonstrative of conscience-shocking executive action.  Simply put, Plaintiffs do not present a factual or legal basis which would allow for an inference of intentionality or of unwarranted or severe intrusion into the familial relationship.

C.       *Plaintiffs Do Not Show a Clearly Established Right Related to Voluntary Safety Plans*

To the extent Plaintiffs allege that the Safety Plan itself, or the process related to it, violated their constitutional rights, the Court concludes they do not meet their burden of proving a clearly established right existed.  A right is clearly established "when a Supreme Court or

Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." *Truman*, 1 F.4th at 1235 (quoting *Thomas*, 765 F.3d at 1194). "The salient question is whether the state of the law at the time of an incident provided 'fair warning' to the defendants that their alleged conduct was unconstitutional." *Reavis Estate of Coale v. Frost*, 967 F.3d 978, 992 (10th Cir. 2020) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)). Put another way, the Tenth Circuit asks, "whether the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Halley v. Huckaby*, 903 F.3d 1136, 1156 (10th Cir. 2018) (internal quotation marks and citations omitted).

Clearly established law "must remain moored in a specific set of facts" to show that the "violative nature of *particular* conduct is clearly established." *Crane v. Utah Dep't of Corr.*, 15 F.4th 1296, 1303 (10th Cir. 2021) (citation omitted) (emphasis in original). To that end, the Supreme Court has repeatedly instructed courts "not to define clearly established law at too high a level of generality." *City of Tahlequah v. Bond*, 142 S.Ct. 9, 11 (2021) (citing *Ashcroft v. al-Kidd*, 563 U. S. 731, 742 (2011)). Notably, plaintiff bears the burden of citing to the Court what they think constitutes clearly established law. *Crane*, 15 F.4th at 1303 (quoting *Thomas v. Durastanti*, 607 F.3d 655, 669 (10th Cir. 2010)).

In this case, the following allegations imply constitutional rights violations related to the Safety Plan:

-       "Importantly, Amber Johnson is not a signatory to the safety plan," (Doc. 58) at 8;

- "The Safety Plan was ambiguous and violated the constitutional rights of association of the biological parents," *id.* at 12;[6] and,

- "Mother requested the return of her child on at least five occasions," *id.* at 14.

But Plaintiffs cite to no case which establishes that a voluntary safety plan can be the source of a parental custody or familial association claim.  Here, the specific claimed constitutional violations, as the Court perceives them, are: (1) the ambiguity of the Safety Plan violated both parents' rights, (2) that the initial implementation of the Plan with only Mr. Thompson's agreement violated Ms. Johnson's rights, and (3) when the Plan persisted beyond her revocation of consent it violated Ms. Johnson's rights.[7]  Plaintiffs do not cite to any case clearly establishing the existence of a constitutional right to detailed safety planning, nor a constitutional right of each parent to initially consent to a safety plan, nor of a right of either parent to unilaterally terminate a Safety Plan in a particular manner.  In fact, all the precedents cited by Plaintiffs are termination of parental rights or emergency circumstances cases and do not address

---

[6] Plaintiffs also make this claim: "In our case, the biological parents were separated from child based on a misrepresented safety plan that excluded the biological father completely and did not assess any danger to child." (Doc. 58) at 8.  But the Court determines no part of that claim is supported by the evidence, which indicates the Safety Plan named threats to R.J. and that Mr. Thompson consented to the plan.

[7] The Court emphasizes that it concluded Ms. Johnson did not establish her revocation of consent in the first instance.  *See supra* Section IV(A).

safety plan issues.[8]  For this reason, Ms. Sanchez could not have reasonably known that

implementing this Safety Plan violated the constitutional rights of Ms. Johnson, Mr. Thompson,

or R.J., and is entitled to qualified immunity.

The Court notes that it understands there are potential reasons to be angered and offended

by the Safety Plan.  Perhaps Ms. Sanchez could have implemented it for a shorter duration, could

have kept R.J. with a biological parent, or could have sought Ms. Johnsons' consent from jail.

But Ms. Sanchez had the burden of making quick decisions regarding the care and safety of an

infant in the dark hours of the night.  These are the sorts of discretionary decisions which,

without a clear prohibition stated in the law, fall within the heartland of the qualified immunity

doctrine.  "[C]onsiderable deference should be given to the judgment of responsible government

officials in acting to protect children from perceived imminent danger or abuse."  *J.B. v.

Washington Cnty.*, 127 F.3d 919, 925 (10th Cir. 1997) (citations omitted).  Because Plaintiffs

---

[8] At different points, in the briefing, Plaintiffs cite to the following cases: *Santosky v. Kramer*, 455 U.S. 745 (1982) (establishing process required to permanently terminate parental rights); *Spielman v. Hildebrand*, 873 f.2d 1377 (10th Cir. 1985) (concluding pre-adoptive parents provided adequate process where provided with hearing prior to termination of parental rights); *Hollingsworth v. Hill*, 110 F.3d 733 (10th Cir. 1997) (finding Sheriff violated mother's clearly established rights when children removed without notice or hearing because no emergency existed); *J.B. v Washington Cnty.*, 127 F.3d 919 (10th Cir. 1997) (holding County officials did not violate procedural due process nor impermissibly interfere with rights of familial association of mother and child when they removed child from her parents' home to interview her about suspected child abuse with court order but no pre-deprivation hearing); *Malik v. Arapahoe Cnty. Dep't of Soc. Servs.*, 191 F.3d 1306 (10th Cir. 1999) (finding clearly established law that officers' procurement of *ex parte* removal order via misrepresentation violated Fourth Amendment); *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230 (10th Cir. 2003) (holding warrantless seizure of child from home based on suspected child abuse due to Munchausen Syndrome by Proxy stated  Fourteenth Amendment violation because no emergency circumstances existed); *JL v. New Mexico Dep't of Health*, 165 F. Supp. 3d 996 (D.N.M. 2015) (finding NM Department of Health violated procedural due process rights of developmentally disabled residents committed to mental health facilities).

raise no clear statement of law on point, the Court must conclude that qualified immunity protects Ms. Sanchez' professional judgment.

V.     *Conclusion*

The Court is sensitive that removal of a child from a home must be disruptive and frustrating, if not outright traumatic.   Nonetheless, the Court concludes that Plaintiffs fail to meet their burden to overcome the qualified immunity bar due to a combination of an insufficiently developed factual record proving a constitutional violation, an unclear statement of what precisely constituted the constitutional violation, and a dearth of cited authority clearly establishing relevant rights.   Because Ms. Sanchez is entitled to qualified immunity, the Court grants the Motion for Summary Judgment.   The Court will enter final judgment separately.

IT IS SO ORDERED.

UNITED STATES DISTRICT JUDGE